Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/16/2022 08:05 AM CST

In re Estate of Walter R. Koetter, deceased.
Richard A. Koetter, individually and as the nominated
Personal Representative of the Estate of Walter R.
Koetter, deceased, appellant and cross-appellee,
v. Debra J. Meyers, appellee and cross-appellant,
and Diana K. Wilkinson et al., appellees.

___ N.W.2d ___

Filed October 7, 2022.    No. S-21-623.

1. **Directed Verdict: Evidence: Appeal and Error.** A directed verdict is proper only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law. In reviewing that determination, an appellate court gives the nonmoving party the benefit of every controverted fact and all reasonable inferences from the evidence.
2. **Judgments: Verdicts: Appeal and Error.** Review of a ruling on a motion for judgment notwithstanding the verdict is de novo on the record.
3. **Judgments: Verdicts.** To sustain a motion for judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion.
4. **____: ____.** On a motion for judgment notwithstanding the verdict, the moving party is deemed to have admitted as true all the relevant evidence admitted that is favorable to the party against whom the motion is directed, and, further, the party against whom the motion is directed is entitled to the benefit of all proper inferences deducible from the relevant evidence.
5. **Verdicts: Appeal and Error.** When reviewing a jury verdict, an appellate court considers the evidence and resolves evidentiary conflicts in favor of the successful party.
6. **Verdicts: Juries: Appeal and Error.** A jury verdict may not be set aside unless clearly wrong, and it is sufficient if there is competent

evidence presented to the jury upon which it could find for the successful party.

7. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by these rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

8. **Trial: Evidence: Appeal and Error.** In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.

9. **Jurisdiction: Appeal and Error.** The question of jurisdiction is a question of law, upon which an appellate court reaches a conclusion independent of the trial court.

10. **Wills: Undue Influence.** Undue influence sufficient to defeat a will is manipulation that destroys the testator's free agency and substitutes another's purpose for the testator's.

11. **Wills: Undue Influence: Proof.** To show undue influence, a will contestant must prove the following elements by a preponderance of the evidence: (1) The testator was subject to, or susceptible to, undue influence; (2) there was an opportunity to exercise such influence; (3) there was a disposition to exercise such influence; and (4) the result was clearly the effect of such influence.

12. **Undue Influence: Proof.** Because undue influence is often difficult to prove with direct evidence, it may be reasonably inferred from the facts and circumstances surrounding the actor: his or her life, character, and mental condition.

13. **Undue Influence.** Mere suspicion, surmise, or conjecture does not warrant a finding of undue influence; instead, there must be a solid foundation of established facts on which to rest the inference of its existence.

14. **Appeal and Error.** An appellate court may find plain error on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. Generally, an appellate court will find plain error only when a miscarriage of justice would otherwise occur.

15. **Motions for New Trial: Appeal and Error.** A motion for new trial is to be granted only when error prejudicial to the rights of the unsuccessful party has occurred.

16. **Statutes: Legislature: Intent.** Components of a series or collection of statutes pertaining to a certain subject matter are in pari materia and should be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions are consistent, harmonious, and sensible.

Appeal from the District Court for Red Willow County: DAVID W. URBOM, Judge. Affirmed in part, and in part vacated and dismissed.

Michael L. Johnson and Jared J. Krejci, of Smith, Johnson, Allen, Connick & Hansen, for appellant.

Lindsay E. Pedersen, Attorney at Law, P.C., L.L.O., for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

PAPIK, J.

In this appeal from a will contest proceeding in district court, the proponent of the will contests the jury's finding that the will was the product of undue influence and therefore invalid. He also claims a new trial is warranted because a purported text message not received in evidence was read on the record and referenced during closing arguments. We find no merit to these arguments. But on cross-appeal, in which the opponent of the will challenges an award of attorney fees and expenses that the district court purported to award pursuant to Neb. Rev. Stat. §§ 30-2481 and 30-2482 (Reissue 2016), we conclude that the district court lacked jurisdiction over that matter. Accordingly, we vacate the portion of the order that purported to award attorney fees and expenses and dismiss the cross-appeal.

## I. BACKGROUND

### 1. PROBATE PROCEEDINGS AND WILL CONTEST INITIATED IN COUNTY COURT

Walter R. Koetter died in 2017 at the age of 88. Thereafter, one of his sons, Richard A. Koetter (Dickie), filed a petition in county court for formal probate of a will executed by Walter in 2014 (2014 will). Dickie was the nominated personal representative of the 2014 will. Debra J. Meyers, one of Walter's daughters, objected to the probate of the 2014 will, alleging, in

part, that it was the result of undue influence. The will contest was transferred to district court pursuant to Neb. Rev. Stat. § 30-2429.01 (Cum. Supp. 2020). The only issue at the ensuing jury trial was whether the 2014 will was invalid as a result of undue influence.

## 2. Will Contest Proceedings
### in District Court

There was evidence at trial that supported both parties' positions as to undue influence; but considering the governing standards of review, we recount the evidence relevant to undue influence in the light most favorable to Debra.

### (a) Koetter Family and Farm and
### Ranch Operation Overview

The jury heard evidence that Walter, a farmer and rancher in McCook, Nebraska, had five surviving children at the time of his death in 2017: Debra, Dickie, Diana K. Wilkinson (Diana), Donna S. Friehe (Donna), and Douglas S. Koetter. Another son, Darin Koetter, died in 2003. Walter's wife, Marilyn Koetter, also died several years before Walter, in 2011.

Unlike most of Walter and Marilyn's other children, Dickie was uninvolved with the family and with the farm for decades. During that time, he had a series of jobs outside McCook. In 2006, Dickie moved back to the area from Lincoln, Nebraska. Walter asked Dickie to return, in part to help with the farm and ranch operation. At first, Dickie lived in town, owned no real estate, and was not involved in Walter's operation. In approximately 2008, Dickie moved from town to live rent free on an acreage owned by Walter, near the home where Walter lived. Around that time, Dickie began working in Walter's operation, along with Douglas, who had been working there for about 40 years. Douglas left the operation after less than 2 years of Dickie's return to the area. Douglas testified that the operation could not comfortably provide for everyone involved and that Walter expressed he did not need Douglas on the farm anymore.

In 2012, Walter transferred a cattle herd to Dickie as compensation, and in 2013 and 2014, Walter paid Dickie wages on a somewhat irregular basis.

### (b) Walter's Wills and Land Transfers

Walter executed several wills between 2003 and 2012. In general, those wills divided the estate equally among his six children, with the children of Walter's deceased son, Darin, receiving his share.

When Walter was 84 years old, he executed the 2014 will on April 25 of that year. The 2014 will devised Walter's property as follows: (1) household goods, valued at $5,000, equally to the five living children; (2) farm machinery and farm equipment, valued at $179,444.71, to Dickie; (3) money in checking or savings accounts, valued at $168,267.66, 70 percent to Dickie and 30 percent to Douglas; (4) life insurance payable to the estate, valued at $84,323.50, to the three daughters; and (5) the remainder of the estate, valued at $5,580.96, 70 percent to Dickie and 30 percent to Douglas.

On the same day that the 2014 will was executed, Walter executed deeds conveying interests in real property to Dickie and Douglas, while reserving a life estate in his own name. Dickie's interest was valued at $1,195,750, and Douglas' interest was valued at $502,053. Debra testified that she was a party to a pending action to set aside the deeds executed April 25, 2014.

### (c) Testimony of Walter's Attorneys

Jon Schroeder had handled Walter's estate planning since 2003 and prepared Walter's 2012 will. He testified that he met with Walter 10 to 20 times between April 2011 and October 2012 to close Marilyn's estate and revise Walter's estate plan. Schroeder denied discussing transferring a significant portion of Walter's assets to Dickie, but on Walter's request, he discussed other options for compensating Dickie, who began attending Walter's meetings with Schroeder in 2011. This was the first time any of Walter's children had attended his estate

planning meetings with Schroeder. Schroeder perceived Dickie to be "tense" and "aggressive" regarding his compensation beginning in September 2012, asking "'How do I get compensated for what I'm doing for dad[?]'" In a meeting sometime after October 30, Dickie asked several times, "'What is in it for me? How am I going to be compensated?'" Schroeder asked Dickie to leave the room so that he could speak to Walter alone. Schroeder testified that Dickie did not seem happy with the request, but left. After he did, Schroeder told Walter, "'I am not feeling comfortable with this conversation with Dickie,'" and Walter replied, "'I'm not either.'" After that meeting, Schroeder never saw or spoke to Walter again.

In executing the 2014 will and deeds, Walter was represented by attorney Justin Hermann. Hermann first met with Walter to discuss changes to Walter's estate plan when Walter came to his office alone in September 2013, having been transported there by someone else. Hermann testified that prior to the estate planning work, he had Walter provide him with two letters from physicians, both finding that Walter had sufficient testamentary capacity.

Hermann testified that he met with Walter on April 16, 2014, in his office. At that time, Walter signed updated powers of attorney and a living will. The will and deeds were prepared, but because some additional changes were needed, they scheduled a followup appointment for their execution. Hermann testified that he learned from Dickie on April 21 that Walter had been hospitalized due to chest pains. He was discharged, but was not allowed to travel, so Hermann arranged to execute the documents in McCook, where Walter lived, rather than at Hermann's office in Kearney, Nebraska. On the day Walter executed the 2014 will, Walter signed an acknowledgment that Dickie and Dickie's wife drove him to the office and participated in a meeting earlier in the day to discuss a farm lease involving Dickie that was part of the estate plan, but that they were not present when Walter and Hermann reviewed the terms of the will. Hermann testified that he had not observed

Walter outside his office and did not see everything happening in Walter's life.

Hermann testified that he had represented Dickie in another matter the month before he met with Walter. Hermann testified he also met with Dickie and his wife to discuss the farm lease, but he never met with Dickie about the 2014 will. However, his billing statements reflect that in 2013 and 2014 he had several 5-to-10-minute telephone conversations with Dickie's wife regarding Walter's "estate planning."

### (d) Testimony by Physicians

The two physicians who examined Walter in 2013 testified. Both opined that Walter was able to make decisions for himself at that time. One of those physicians admitted that he would not be aware if Walter was being subjected to undue influence by a family member.

### (e) Testimony by Walter's Family and Neighbors

Debra testified that after Marilyn moved to a nursing home in 2009, other family members were "taking care" of Walter, who at that time continued to work in the field. She testified, "I would do, you know, whatever he needed to do. I was helping him." This included taking "sandwiches out to him," buying his groceries, taking him to medical appointments, and coordinating his Veterans Affairs benefits.

Members of Walter's family testified that before Marilyn's death in April 2011, Walter frequently gathered with his children and grandchildren multiple times a week for meals, farmwork, and celebrations, but Dickie rarely participated in any family gatherings, despite being invited. After Marilyn's death, the family as a whole no longer celebrated special events with Walter; he celebrated only with Dickie. Debra recalled that after Marilyn's death, she tried to take Thanksgiving dinner to Walter, but he declined, saying that "Dick[ie] wouldn't like it." Debra testified that from September 2012 until October 2013, whenever she was at Walter's house, Dickie and his wife were present.

Several family members testified that when they visited Walter alone, he seemed to be checking to see if Dickie was approaching, and Diana described Walter's behavior on these occasions as "agitated" and "fidgety." Another relative testified that if Dickie did arrive, Walter became less talkative. Some viewed Dickie as curtailing Walter's contact with the rest of the family.

After 2011, Dickie and his wife, whom Dickie married in 2013, took over buying Walter's groceries and taking him to medical appointments. Dickie did not communicate information about Walter's medical condition to the rest of the family as Debra had. Dickie also became a signatory on Walter's checking account and Walter's power of attorney, whereas Debra previously had been Walter's power of attorney. Dickie testified that he would prepare Walter's lunch daily and help Walter with bills by addressing and stamping envelopes.

Several family members testified that they did not believe Walter had the ability to make his own decisions after October 2012 and that they believed Dickie was influencing Walter and overpowering his decisions. Two relatives familiar with the operation testified that after Dickie came back to town, Walter, who previously had an opinion on everything and made decisions on his own, could not make a decision without consulting with Dickie. One of the relatives recounted that once when he was outdoors, a "couple hundred yards away" from Dickie and Walter, he heard Dickie "screaming" at Walter. On another occasion, the same relative saw Walter outside in 102-degree heat, "covered in sweat," and advised Walter to go inside to avoid heatstroke. Walter replied, "'Well, I was told to stay . . . here. [Dickie's] going to yell at me,'" but Walter was subsequently convinced to return to the house. According to Douglas, Walter had phased out of the operation as he aged, and "eventually . . . you could say he was out." When Dickie and his wife were out of town in 2013, a neighbor helped Walter with farm chores at Dickie's residence.

Several of Walter's children said that Walter had changed after Dickie came back, in that he had lost the "spark in his eye" and his typical "easygoing," "calm," "happy," and "sharp" demeanor; watched television rather than being active on the farm; and no longer expressed an interest in family members other than Dickie and Dickie's wife. In describing Walter after Dickie joined the operation, they used descriptions such as "shaky," "deathly afraid" of Dickie, "uncomfortable" around the rest of the family, "a whipped puppy," "beaten down," "stressed," "closed up," "timid," "nervous," "cowered," "just giving up," "going downhill," and "getting more intimidated all the time."

Jeremy Meyers, one of Walter's grandsons, testified that Walter was "getting manipulated" and that Dickie was "starting to put some pressure" on Walter in late 2012 or early 2013. Jeremy recalled that in July 2013, Walter wrongly accused him of wanting to take over the operation and Walter said he had heard it from Dickie. Jeremy testified that in September 2013, he received a text message from Walter's phone that was intended, at least in part, for Dickie's wife. Shortly after, Jeremy received a call from Walter, who addressed him as "'Jeremy'" rather than "'Jerm'" as he always had. During the call, Jeremy heard two voices, and in his opinion, Dickie was coaching Walter to instruct Jeremy to delete the text message. Jeremy detected shakiness in Walter's voice and was concerned that Walter was under "severe duress." Later, at about 7 p.m., Jeremy went to check on Walter, who he found sitting in the dark, "shaking uncontrollably" and "virtually sobbing." Jeremy asked Walter, "'Did he do something to you?'" but Walter "wouldn't tell" Jeremy. Jeremy testified that he was concerned enough about the incident to report it to law enforcement.

Walter communicated to several family members and a neighbor that he intended to change his previous estate plan to leave the majority of his assets to Dickie and Douglas. Family members were also aware that Walter had sought out

a new attorney. Diana recognized that Walter wanted to leave a legacy in regard to his farm but believed Dickie was making the decisions. Debra testified that in October 2013, Dickie informed her, in Walter's presence, that Darin's children were "being taken completely out of the will." Debra testified that she believed they should be included and argued with Dickie about the matter, and Dickie's wife also stated her opinion, but Walter did not say a word. Another daughter, Donna, testified that Walter told her about his new estate plans in 2016. To Donna, Walter seemed "anxious" and aware that the information would hurt her. When Donna told Walter that she respected his decision but did not agree, Walter responded, "'Dick[ie] says this is how it should be.'"

Dickie denied ever telling Walter how to make his will or to transfer land, but he testified that he told Walter that if he divided his estate equally among his children, it would likely be sold to someone outside the family after his death because the children could not "get along."

### (f) Undue Influence Expert; Testimony and Argument Concerning Text Message

Dr. Lindsey Wylie, an expert called by Dickie, was the first witness to testify on the second day of the 4-day trial. She testified to her opinions that Walter's level of cognition was high on the date he executed the 2014 will and that he was not susceptible to undue influence. She based her opinion on depositions and exhibits supplied to her by Dickie's counsel.

On cross-examination, Debra's counsel elicited Wylie's testimony that if the information supplied to her was faulty or incomplete, her opinion would be faulty or incomplete. Wylie confirmed that one of the depositions supplied by Dickie's counsel was that of Dickie's wife. The following colloquy then took place:

> Q. So if [Dickie's wife] has said—made opposite statements or contradictory statements, would that be

something you'd . . . want to take into account when you're relying on her deposition?

A. Contradictory statements at what point?

Q. Subsequent to her deposition.

A. I mean, . . . I guess, it would be something I would . . . want to have known about then when I rendered my report.

Q. But you were not aware of that?

A. I don't know what the contradictory statements are, so I can't speak to it.

Q. Well, if [Dickie's wife] indicated in a text to family, "Dick[ie] was behind all the will changing, and grandpa had—and had grandpa and I scared to death if it wasn't done, he would do something", would that be a statement you would be considering—want [to] consider when . . . rendering an opinion?

A. Yep.

[Dickie's counsel]: Your Honor, I would object. That matter's not in evidence. I would move to strike.

[Debra's counsel]: Your Honor, she asked what it said.

THE COURT: Yeah, the objection's overruled. I think she can answer whether or not that would be something she would have considered.

BY [Debra's counsel]:

Q. Would something—that statement want [sic] you to further vet [Dickie's wife]?

A. Of course, I would want to have all the information at the time I rendered my report.

Later during the trial, Dickie's counsel requested a copy of the text message. Debra's counsel acknowledged that it would not have been provided in response to discovery, but said Debra planned to use it "when [Dickie's wife] shows up." The district court overruled the "objection," but noted that Dickie's counsel would not be prohibited from making a similar request later. Dickie's wife did not testify at trial, and Dickie's counsel did not renew his request for a copy of the text message.

The text message came up again in closing arguments. Debra's counsel stated that Wylie's opinion was based on depositions supplied by opposing counsel, "not the full information." He next mentioned the text message, and Dickie's counsel objected:

[Debra's counsel]: . . . I think she clarified that, saying it's only as good as what she's been given. And when I asked her about [Dickie's wife], and I question, what if [Dickie's wife] had sent a text message? She says, what's the text message say?

[Dickie's counsel]: Objection, Your Honor.

THE COURT: Objection is sustained. The text message isn't in evidence.

[Debra's counsel]: The question and answer.

THE COURT: Yes, but not anything about the text message.

[Debra's counsel]: No, I quoted the text message.

THE COURT: Okay. You're fine.

[Dickie's counsel]: I thought that question was stricken.

[Debra's counsel]: No, it's still in the evidence.

THE COURT: Yeah, it's in. Yeah, the objection is sustained.

Just as long as you don't bring up anything about any text message.

[Debra's counsel]: Okay.

THE COURT: As far as the content of the text message.

[Debra's counsel]: But it's already in evidence. When I asked the question, I specifically read it. There was no objection, and it was answered.

[Dickie's counsel]: There was an objection.

Your Honor, can we approach?

[Debra's counsel]: Okay. Your Honor, that's fine.

THE COURT: You're okay? All right.

[Debra's counsel]: All right. Okay. So she said if she didn't have all the facts with [Dickie's wife], she

basically said, "Yeah, I'd have to reconsider that", is what her testimony was.

So, basically, she acknowledged she doesn't have all the facts and yet —

[Dickie's counsel]: Objection, Your Honor. Can we approach?

(An off-record sidebar was held.)

THE COURT: Go ahead, [Debra's counsel].

[Debra's counsel]: Dr. Wylie indicated several of the witnesses weren't fully vetted for her, and that she also indicated that her ability to give an opinion relied solely on what was supplied to her, solely supplied on one side . . . .

So when you look at — the expert witness instruction indicates — you take an expert — she's no different than you when coming to this final conclusion, so don't let her opinion — or first — apparently, first expert opinion, which is not fully vetted, sway you in any way. The credibility you give her is entirely up to you.

The jury was instructed that statements, arguments, and objections by attorneys were not evidence for its consideration, nor were questions and answers for which objections had been sustained.

### (g) Jury Verdict and Subsequent Motions and Orders

The jury returned a verdict finding that the 2014 will was not valid. The district court accepted the verdict.

Dickie then filed a motion to alter or amend, which asked the district court to rule on a motion for attorney fees and expenses pursuant to § 30-2481 that he had earlier filed in the district court. On the same day, Dickie filed a motion for judgment notwithstanding the verdict. In the alternative, Dickie moved for a new trial.

In the same order, the district court overruled the motions for judgment notwithstanding the verdict and for a new trial,

and sustained the motion to alter or amend regarding attorney fees and expenses in the amount of $196,914.47. In ruling on attorney fees and expenses, the district court cited §§ 30-2481 and 30-2482.

Dickie filed an appeal, and Debra cross-appealed.

## II. ASSIGNMENTS OF ERROR

On appeal, Dickie assigns several grounds for reversal that, consolidated and restated, fall into two general categories. The first category relates to his position that Debra did not meet her burden of proving the 2014 will was invalid: He claims that the evidence was insufficient to sustain the jury's verdict and that the district court erred in denying his motions for directed verdict, judgment notwithstanding the verdict, and new trial. The second category concerns the text message. Dickie asserts (1) that the district court erred in allowing Debra's counsel to ask his expert about the purported text message, denying his motion to strike his expert's response, and not granting his motion for a new trial based on that exchange, and (2) that misconduct by Debra's attorney during closing arguments misled the jury regarding the text message to such a degree that it resulted in an unjust verdict and constituted plain error.

On cross-appeal, Debra assigns that the district court erred in awarding attorney fees and expenses to Dickie and in fixing the amount of those fees.

## III. STANDARD OF REVIEW

[1] A directed verdict is proper only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law. In reviewing that determination, an appellate court gives the nonmoving party the benefit of every controverted fact and all reasonable inferences from the evidence. *Arens v. NEBCO, Inc.*, 291 Neb. 834, 870 N.W.2d 1 (2015).

[2-4] Review of a ruling on a motion for judgment notwithstanding the verdict is de novo on the record. *Valley Boys*

*v. American Family Ins. Co.*, 306 Neb. 928, 947 N.W.2d 856 (2020). To sustain a motion for judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. *Id.* On a motion for judgment notwithstanding the verdict, the moving party is deemed to have admitted as true all the relevant evidence admitted that is favorable to the party against whom the motion is directed, and, further, the party against whom the motion is directed is entitled to the benefit of all proper inferences deducible from the relevant evidence. *Id.*

[5,6] When reviewing a jury verdict, an appellate court considers the evidence and resolves evidentiary conflicts in favor of the successful party. *Pantano v. American Blue Ribbon Holdings*, 303 Neb. 156, 927 N.W.2d 357 (2019). A jury verdict may not be set aside unless clearly wrong, and it is sufficient if there is competent evidence presented to the jury upon which it could find for the successful party. *Id.* See, also, *In re Estate of Disney*, 250 Neb. 703, 550 N.W.2d 919 (1996).

An appellate court reviews the denial of a motion for new trial for an abuse of discretion. See *Schmid v. Simmons*, 311 Neb. 48, 970 N.W.2d 735 (2022).

[7,8] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by these rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *Brown v. Morello*, 308 Neb. 968, 957 N.W.2d 884 (2021). In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party. *In re Estate of Clinger*, 292 Neb. 237, 872 N.W.2d 37 (2015).

[9] The question of jurisdiction is a question of law, upon which an appellate court reaches a conclusion independent of the trial court. *State ex rel. Peterson v. Creative Comm. Promotions*, 302 Neb. 606, 924 N.W.2d 664 (2019).

## IV. ANALYSIS

### 1. Undue Influence

We begin with the issue at the heart of these proceedings, undue influence. At trial, Dickie made several attempts to preempt or overturn the jury's verdict that found the 2014 will invalid. He made unsuccessful motions for a directed verdict at the close of Debra's case and at the close of all the evidence, for judgment notwithstanding the verdict, and, in the alternative, for new trial, all on the grounds that the evidence did not prove undue influence. On appeal, he challenges the district court's rulings on those motions and further assigns that the evidence was insufficient to sustain the jury's verdict. We note at the outset that Dickie cannot now challenge the ruling on the motion for directed verdict he made at the close of Debra's evidence because he proceeded to present his own evidence after that motion was overruled. See *Anderson v. Babbe*, 304 Neb. 186, 933 N.W.2d 813 (2019). As for the remaining motions, we address Dickie's arguments in a general manner by considering whether there was competent evidence that allowed the jury to reasonably find that Walter executed the 2014 will as the result of undue influence. Although some evidence supported Dickie's position, other evidence supported Debra's position, and under the applicable standards of review, we conclude that the evidence was sufficient to sustain the jury's verdict in Debra's favor.

[10,11] Undue influence sufficient to defeat a will is manipulation that destroys the testator's free agency and substitutes another's purpose for the testator's. *In re Estate of Clinger, supra*. To show undue influence, a will contestant must prove the following elements by a preponderance of the evidence: (1) The testator was subject to, or susceptible to, undue influence; (2) there was an opportunity to exercise such influence; (3) there was a disposition to exercise such influence; and (4) the result was clearly the effect of such influence. See *In re Estate of Barger*, 303 Neb. 817, 931 N.W.2d 660 (2019). See, also, *Spinar v. Wall*, 191 Neb. 395, 215 N.W.2d 98 (1974).

[12,13] Because undue influence is often difficult to prove with direct evidence, it may be reasonably inferred from the facts and circumstances surrounding the actor: his or her life, character, and mental condition. *In re Estate of Barger, supra*. Mere suspicion, surmise, or conjecture does not warrant a finding of undue influence; instead, there must be a solid foundation of established facts on which to rest the inference of its existence. *Mock v. Neumeister*, 296 Neb. 376, 892 N.W.2d 569 (2017).

Dickie mainly challenges the jury's verdict by arguing that because the evidence did not show that Walter suffered from a mental or physical impairment, it did not establish that he was susceptible to undue influence. Dickie appears to take the position that mental or physical impairment is a required element of undue influence. Although we have said that suspicious circumstances tending to show undue influence are indicated when there is "an elderly testator in a weakened physical or mental condition," *In re Estate of Barger*, 303 Neb. at 835, 931 N.W.2d at 674, we have not held that mental or physical impairment is essential to a finding of undue influence. And although there was no evidence that Walter had a specifically diagnosed mental or physical impairment at the time he executed the 2014 will, there was evidence that Walter, who was 84 years old when he executed the 2014 will, exhibited signs of decline. Whereas Walter previously had been "easygoing," "calm," "happy," and "sharp," and had a "spark in his eye," there was testimony that after Dickie's return, he became "shaky," "stressed," "closed up," "timid," and "nervous"; "cowered" like a "whipped puppy"; and seemed to be "just giving up" and "going downhill."

In addition, there are other factors that can demonstrate susceptibility to undue influence. In assessing susceptibility, "[t]he question is . . . whether [the testator's] natural defenses are lowered leaving [him or] her unable to resist the suggestions of a stronger, more determined individual." *In re Estate of Glass,* 85 Wis. 2d 126, 140, 270 N.W.2d 386, 393 (1978).

Factors showing susceptibility recognized by this court have included a testator's age, health, and dependence on the person accused of undue influence for transportation, groceries, and business affairs. See, *In re Estate of Wagner*, 246 Neb. 625, 522 N.W.2d 159 (1994); *In re Estate of Bainbridge*, 151 Neb. 142, 36 N.W.2d 625 (1949); *In re Estate of Bowman*, 143 Neb. 440, 9 N.W.2d 801 (1943).

Other jurisdictions have likewise cited similar factors, including dependence and a tendency to be passive and easily swayed. See, *Moriarty v. Moriarty*, 150 N.E.3d 616 (Ind. App. 2020) (basing finding of susceptibility on recent death of loved one, anxiety and depression, medical conditions, isolation from family and friends, and dependency on others); *Matter of Estate of Smith*, 164 Idaho 457, 476, 432 P.3d 6, 25 (2018), quoting *King v. MacDonald*, 90 Idaho 272, 410 P.2d 969 (1965) (finding testator susceptible to accused influencer's specific influence and stating that "determining whether a testator was susceptible to undue influence 'requires a consideration of many circumstances, including his state of affections or dislike for particular persons, benefited or not benefited by the will; of his inclinations to obey or to resist these persons; and, in general, of his mental and emotional condition with reference to its being affected by any of the persons concerned'"); *Erickson v. Olsen*, 844 N.W.2d 585, 594 (N.D. 2014) (affirming district court's finding of undue influence where, in contrast to case in which decedent was "'his own boss'" and found not susceptible, testator was "passive and easily influenced" and dependent on care of others); *Hernon v. Hernon*, 74 Mass. App. 492, 498-99, 908 N.E.2d 777, 783 (2009) (testator's susceptibility to undue influence by brother shown by evidence that although the two had strained and distant relationship, testator had no choice but to have brother move into his home to care for him; that he was dependent on brother who drove him to appointments, including one to attorney's office to execute will 2 months before he died; and that brother stated "'[testator] will do exactly what I want when it come[s] to his will or

I'm out of here'"); *In re Estate of Glass, supra* (susceptibility factors include testator's age, personality, physical and mental health, and ability to handle business affairs); *In re Feitag's Estate*, 9 Wis. 2d 315, 321-22, 101 N.W.2d 108, 111 (1960) (testator's susceptibility shown by "testimony that she was easily led or swayed by people about her," including incident in which she "talked about selling a washing machine, but she didn't know whether she would because she didn't think the appellant would like it"). See, also, *In re Estate of Milas*, No. 98-2511, 1999 WL 627680 at *3 (Wis. App. Aug. 19, 1999) (unpublished opinion listed in table at 230 Wis. 2d 186, 603 N.W.2d 748 (Wis. App. 1999)) (identifying fact that "testator was unusually receptive to the suggestions of another to whom he consistently deferred on matters of personal importance" as evidence of susceptibility to undue influence).

In our view, there was other evidence in this case that, in addition to Walter's decline, supported a finding that Walter was susceptible to undue influence. Evidence at trial supported the inference that Walter was susceptible to undue influence because Walter depended on Dickie to manage matters ranging from groceries to the farming operation. Evidence showed that after Marilyn entered the nursing home in 2009, Walter depended on his family's assistance with groceries, food, and medical appointments. After Marilyn died in 2011, Walter came to rely on Dickie or Dickie's wife to buy his groceries, prepare food for him, and take him to medical appointments and meetings with his attorneys. According to evidence, in the years before the 2014 will and afterward, it was only Walter and Dickie involved in Walter's operation. Douglas testified that Walter's involvement in the operation diminished as he aged, until he "was out." There was testimony that rather than being active on the farm, Walter stayed inside and watched television.

There was also evidence from which the jury could infer that Walter had become passive and easily led, making him susceptible to undue influence. The jury heard evidence that

Walter altered his longtime estate plans despite expressing discomfort with Dickie's involvement. From 2003 to 2014, Walter had consistently maintained an estate plan that generally divided his assets equally among his children. In September 2011, Dickie began attending meetings between Walter and Schroeder, who had prepared Walter's previous wills. The jury heard Schroeder's testimony that in October 2012, he was "'not feeling comfortable'" with Dickie's "aggressive" and repetitive questions about his own compensation during a consultation with Walter, so much so, that Schroeder asked Dickie to leave the room. Schroeder recounted that when he expressed his discomfort to Walter, Walter agreed that he too was uncomfortable. That was the last time Schroeder saw Walter. Soon afterward, Walter began consulting about his estate plan in Kearney with Hermann, who had represented Dickie in another matter just the previous month. Hermann eventually prepared the 2014 will that substantially changed Walter's prior estate planning.

Other evidence also allowed the jury to make inferences regarding Walter's passivity and tendency to yield. The jury heard testimony that before Dickie's return, Walter made his own decisions, but witnesses testified that afterward, Walter could not make a decision without Dickie, who had been heard "screaming" at Walter. Jeremy testified about a time in September 2013 when Dickie seemed to be coaching Walter to ask Jeremy to delete a text message involving Dickie's wife that was mistakenly sent from Walter's phone. Based on Walter's voice, Jeremy testified that he thought Walter was under "severe duress." Witnesses recalled specific statements Walter made that showed Dickie's influence over how Walter celebrated Thanksgiving, whether he stayed outdoors in extreme heat, how he communicated with the rest of the family, how he ran his operation, and, most significantly, how he devised his estate. Donna testified that when she expressed disagreement with Walter's plans to leave most of his assets to Dickie and Douglas, Walter responded, "'Dick[ie] says this is

how it should be.'" And there was evidence that it was Dickie who informed Debra of certain provisions of the 2014 will and, in tandem with his wife, argued with Debra when she objected, while Walter sat silent. Dickie admitted that he told Walter that if he divided his estate equally among his children as he had long planned, it would likely be sold to someone outside the family after his death because the children could not get along.

We are also unpersuaded by Dickie's allegation that proof of undue influence failed because the 2014 will was not executed in secret. We have observed that undue influence can be difficult to prove because it is "usually surrounded by all possible secrecy" and "[is] not exert[ed] in a crowd." *In re Estate of Hedke*, 278 Neb. 727, 743, 775 N.W.2d 13, 28 (2009). But we have not required secrecy to prove undue influence, and we made the foregoing observations to explain why undue influence often rests on inferences drawn from circumstantial evidence. See *id.* "Such evidence shows a course of conduct over a period of time intended to influence the mind of the testator." *In re Estate of Villwok*, 226 Neb. 693, 698, 413 N.W.2d 921, 925 (1987). Here, the jury could have inferred that Walter's informing his family about the content of the 2014 will weighed against a finding of undue influence, but it would not have been unreasonable for the jury to make the opposite inference that these communications were a product of undue influence that Dickie had already exerted largely in secret. The fact that Walter did not conceal the provisions of the 2014 will from his children does not render the jury's undue influence finding unreasonable.

## 2. Text Message

Dickie next presents two assignments of error related to Debra's counsel's reference during the cross-examination of Wylie to a purported text message sent by Dickie's wife. He first argues that the district court erred by allowing the question and not immediately striking Wylie's answer from

the record. Additionally, he argues that the district court's response to counsel's reference to the text message in closing arguments was plain error. We disagree with both of Dickie's arguments.

Beginning with Dickie's contentions regarding the initial cross-examination, Dickie asserts that the question Debra's counsel asked about the purported text message was improper, because the text message was not in evidence. According to Dickie, the only reason Debra's counsel could have had for asking the question was to get information damaging to Dickie's case that was not admitted into evidence before the jury. For these reasons, Dickie argues that the district court abused its discretion by not sustaining his objection and granting his motion to strike Wylie's answer.

There is no dispute that at the time the question at issue was asked, no evidence had been admitted of Dickie's wife's sending a text message like the one described by Debra's counsel. Likewise, there is no dispute that no such evidence was ever admitted. Based on our record, then, we must treat the question as a hypothetical question that assumed facts that were not yet, and never were, admitted into evidence. Even framed this way, however, we conclude that the district court could, within the bounds of its discretion, permit the question and overrule Dickie's motion to strike.

There may be circumstances in which a party wishes to cross-examine an expert witness by asking a hypothetical question that refers to certain facts not yet in evidence. Although this court does not appear to have specifically addressed the matter, a number of courts and commentators have recognized that, in such a situation, a trial court has discretion to permit the question even though the supporting evidence has not been admitted. As the Illinois Supreme Court has explained, a trial court can permit a party to ask a question that assumes facts not yet in evidence in cross-examination, because the cross-examining party may not have yet had the opportunity to present the evidence referred to in the question. See *Coriell v.*

*Industrial Com.*, 83 Ill. 2d 105, 413 N.E.2d 1279, 46 Ill. Dec. 166 (1980). If such a question is permitted and the evidence never materializes, that court explained, there is a safeguard—a subsequent motion to strike by the opposing party. See *id.*

The Hawaii Supreme Court reached the same basic conclusion in *Barretto v. Akau*, 51 Haw. 383, 463 P.2d 917 (1969), as to hypothetical questions that were based on facts not yet in evidence and aimed at demonstrating an alternative theory or contesting a substantive element of the case. That court also held that a trial court could permit such questions if the cross-examiner anticipated in good faith that the facts would be established later in the trial. It also explained that if the cross-examining party failed to eventually introduce evidence of the facts assumed, the opponent's remedy was a motion to strike at the close of all evidence. See, also, *United States v. Benford*, 479 Fed. Appx. 186 (11th Cir. 2011) (finding no error in case in which trial court permitted line of questioning which assumed facts not yet in evidence on assumption that questioning party would later introduce evidence supporting assumptions and opposing party did not request curative instruction when such evidence was not later admitted); 1 McCormick on Evidence § 14 at 134 (Robert P. Mosteller ed., 8th ed. 2020) (explaining that in most jurisdictions, "there is no invariable requirement that the supporting evidence be admitted before the interrogating counsel poses the hypothetical question to the expert").

The foregoing authorities persuade us that a trial court does not necessarily abuse its discretion if it permits a party to ask an expert a question that assumes facts not yet in evidence during cross-examination. Having reached this conclusion, we can conclude rather easily that the district court did not abuse its discretion by allowing the question and overruling Dickie's motion to strike here.

Wylie was the first witness to testify on the second day of a 4-day trial. She generally testified that based on her review of deposition testimony and other information provided to her,

she did not believe Walter was susceptible to undue influence. Among the materials she considered in forming that opinion was the deposition testimony of Dickie's wife. The question at issue made reference to a purported text message sent by Dickie's wife that presumably contradicted that deposition testimony. And although Debra's counsel did not mention that Debra intended to offer evidence of the text message at the time the question was asked and corresponding objection was made, later that same day, he did represent to the district court that the text message would be "use[d]" when Dickie's wife was called to testify. Under these circumstances, it was not clearly untenable for the district court to permit Debra's counsel to ask Wylie if a text message like the one described would affect her conclusions. See *Barnett v. Happy Cab Co.*, 311 Neb. 464, 973 N.W.2d 183 (2022) (judicial abuse of discretion exists when reasons or rulings of trial judge are clearly untenable, unfairly depriving litigant of substantial right and denying just results in matters submitted for disposition).

We recognize that Dickie's wife ultimately did not testify and that evidence of the text message was not received into evidence. This may have entitled Dickie to a ruling striking Wylie's answer at the close of all evidence, but he did not request such a ruling.

[14] This leaves Dickie's contention regarding the closing argument made by Debra's counsel. Dickie frames his argument in plain error terms. We have said that an appellate court may find plain error on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Senteney*, 307 Neb. 702, 950 N.W.2d 585 (2020). Generally, we will find plain error only when a miscarriage of justice would otherwise occur. *Id.*

We presume Dickie presents a plain error argument because he cannot contend that the district court erred in ruling on the

objection he actually asserted during closing argument. When Debra's counsel first made reference to a text message, Dickie's counsel objected, but the district court sustained the objection and directed Debra's counsel not to refer to the text message.

Unable to establish that the district court erred in response to his objection, Dickie apparently argues that the district court had an obligation to take additional action in response to Debra's closing argument on its own initiative. Here, Dickie takes issue with statements by Debra's counsel that the text message and Wylie's answer were in evidence and with what he contends was an argument by Debra's counsel that Wylie admitted she would reconsider her opinions in light of the text message.

To the extent Dickie is arguing that the district court was obligated to interrupt Debra's closing argument sua sponte to address the statements to which he now objects, we disagree. When considering arguments that a trial court erred by "allowing" testimony to which there was no objection, we have discussed the fact that even when a question or answer is arguably improper, sua sponte action by the trial court may interfere with a party's trial tactics by bringing unwanted attention to the testimony. See *Senteney, supra*. In our view, similar considerations apply in the closing argument context.

[15] Neither can we agree with Dickie that the district court was obligated to grant his motion for new trial based on the closing argument of Debra's counsel. A motion for new trial is to be granted only when error prejudicial to the rights of the unsuccessful party has occurred. *Hemsley v. Langdon*, 299 Neb. 464, 909 N.W.2d 59 (2018). Further, we review the district court's denial of the motion for new trial for an abuse of discretion. See *id.* We discern no such abuse. The district court sustained Dickie's objection and precluded Debra's counsel from referring to the text message in oral argument. Although Debra's counsel stated that the text message was in evidence, we understand that statement to have been made as an argument to the district court responsive to Dickie's objection,

not an argument to the jury. In any event, the jury had been instructed that statements, arguments, and objections by attorneys were not evidence. And we do not understand Debra's counsel to have clearly argued that Wylie admitted she would have to reconsider her opinions in light of the text message.

### 3. Attorney Fees and Expenses

In her cross-appeal, Debra argues that the district court erred when it ordered that Dickie was entitled to attorney fees and expenses incurred in defending the will contest proceeding. Before reaching this issue, however, it is our duty to determine whether we have jurisdiction to decide it. See *Green v. Seiffert*, 304 Neb. 212, 933 N.W.2d 590 (2019).

When a lower court lacks subject matter jurisdiction to decide an issue, an appellate court also lacks the power to resolve the issue. See *In re Estate of Evertson*, 295 Neb. 301, 889 N.W.2d 73 (2016). This case presents a question as to whether the district court had subject matter jurisdiction to order that Dickie was entitled to attorney fees and expenses pursuant to § 30-2481. Although not initially raised by the parties, we directed the parties to file supplemental briefs on the issue. In their respective supplemental briefs, Debra argues that the district court lacked jurisdiction and that any award of attorney fees pursuant to § 30-2481 must be ordered by the county court, while Dickie maintains that the district court had jurisdiction to make its attorney fees order.

We begin our analysis by reviewing various statutory provisions that we believe are helpful in framing the question. First, under Neb. Rev. Stat. § 24-517(1) (Reissue 2016), county courts have exclusive jurisdiction over all matters relating to decedents' estates, including the probate of wills and construction thereof. See *In re Estate of Forgey*, 298 Neb. 865, 906 N.W.2d 618 (2018). Notwithstanding this grant of authority to county courts, § 30-2429.01 authorizes parties to transfer proceedings regarding the validity of a will to the district court. Section 30-2429.01 provides, in relevant part:

(3) Upon the filing of the certification as provided in subsection (2) of this section in the district court, such court shall have jurisdiction over the proceeding on the contest. Within thirty days of the filing of such certification, any party may file additional objections.

(4) The district court may order such additional pleadings as necessary and shall thereafter determine whether the decedent left a valid will. Trial shall be to a jury unless a jury is waived by all parties who have filed pleadings in the matter.

(5) The final decision and judgment in the matter transferred shall be certified to the county court, and proceedings shall be had thereon necessary to carry the final decision and judgment into execution.

Dickie sought an award of attorney fees in the district court pursuant to § 30-2481, which provides: "If any personal representative or person nominated as personal representative defends or prosecutes any proceeding in good faith, whether successful or not he is entitled to receive from the estate his necessary expenses and disbursements including reasonable attorneys' fees incurred."

We believe the following section, § 30-2482, is also relevant. Subsection (1) of § 30-2482 provides:

After notice to all interested persons or on petition of an interested person or on appropriate motion if administration is supervised, the propriety of employment of any person by a personal representative including any attorney, [or] the reasonableness of the compensation of any person so employed, . . . may be reviewed by the court.

Subsection (2) of § 30-2482 lists a number of factors that may be considered in determining the reasonableness of a fee.

In our view, the question of whether the district court had jurisdiction to order that Dickie receive an award of attorney fees and expenses pursuant to § 30-2481 depends on the scope of authority granted to the district court by statute. We find the scope of the district court's statutory authority to be

crucial, because the district court's general jurisdiction does not extend to probate matters, and thus, any district court authority over such matters is derived from and limited by legislative grant. See *In re Estate of Sehi*, 17 Neb. App. 697, 772 N.W.2d 103 (2009).

On the subject of statutory authority, § 30-2429.01(4) plainly authorizes the district court to determine whether the decedent left a valid will. In one of our recent opinions, we cited that subsection for the proposition that a district court's authority over a will contest is "limited to determin[ing] whether the decedent left a valid will." See *Bohling v. Bohling*, 309 Neb. 625, 634, 962 N.W.2d 224, 231 (2021). Debra relies on that language to argue that the district court lacked authority to also order that Dickie be reimbursed for his attorney fees and expenses pursuant to § 30-2481. We believe that this issue is slightly more complicated and that we cannot resolve it merely by citing this language in *Bohling, supra*.

While § 30-2429.01(4) does direct that the district court is to determine whether the challenged will was valid, subsection (3) provides that when a will contest is duly transferred to the district court, the district court obtains "jurisdiction over the proceeding on the contest." We understand this language to give the district court jurisdiction over the will contest proceeding and thus the authority to resolve issues that bear on whether the decedent left a valid will. We recognized as much in *Bohling, supra*, stating that the district court in a will contest may decide issues of will construction to the extent they bear on the will's validity. Because the district court is given jurisdiction over the will contest proceeding, we also understand the district court to have the authority to issue orders instrumental to a determination of whether the challenged will is valid on matters such as the admissibility of evidence or the conduct of discovery.

We disagree with Dickie, however, that a determination of whether a personal representative or nominated personal representative should be reimbursed by the estate for attorney

fees incurred in a will contest pursuant to § 30-2481 is rightfully encompassed within the will contest proceeding. Instead, we are persuaded that such a determination is part of the rest of the probate proceeding and committed to the jurisdiction of the county court. This conclusion is informed by §§ 30-2481 and 30-2482. As described above, § 30-2481 provides that a personal representative or nominated personal representative is, under certain conditions, entitled to be reimbursed by the estate for expenses incurred in estate litigation, including reasonable attorney fees. And, as described above, § 30-2482 directs that a personal representative's employment of persons, including attorneys, and the reasonableness of compensation paid to such persons are subject to court review.

[16] We find that the foregoing statutes pertain to the same subject matter and are thus subject to our principle of statutory interpretation governing statutes in pari materia. As we often say, components of a series or collection of statutes pertaining to a certain subject matter are in pari materia and should be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions are consistent, harmonious, and sensible. *In re William R. Zutavern Revocable Trust*, 309 Neb. 542, 961 N.W.2d 807 (2021). Applying this principle here, we find that § 30-2482 sets forth the procedure by which a court is authorized to determine whether and to what extent a personal representative or nominated personal representative is entitled to be reimbursed from the estate for expenses in estate litigation pursuant to § 30-2481. Importantly, § 30-2482 provides that such review is to be completed by "the court." This is significant because, under the Nebraska Probate Code, with an exception not applicable here, "the court" is defined to refer to the county court unless "the context otherwise requires." See Neb. Rev. Stat. § 30-2209 (Reissue 2016). We do not believe that the context of § 30-2482 requires that "the court" mean anything other than the county court, as provided in § 30-2209.

We find confirmation of our conclusion that § 30-2482 provides the procedure by which a court can review claims for reimbursement pursuant to § 30-2481 in an opinion of the North Dakota Supreme Court. See *Matter of Estate of O'Connell*, 476 N.W.2d 8 (N.D. 1991). That court interpreted North Dakota statutes based on the same Uniform Probate Code provisions upon which §§ 30-2481 and 30-2482 are based. It found that claims for reimbursement for estate litigation sought under § 30-2481's North Dakota counterpart were subject to court review pursuant to § 30-2482's North Dakota counterpart. See *Matter of Estate of O'Connell, supra*.

We are not swayed from our conclusion that a determination under § 30-2481 is committed to the jurisdiction of the county court by Dickie's reliance on *In re Estate of Miller*, 231 Neb. 723, 437 N.W.2d 793 (1989), *disapproved, In re Estate of Anderson*, 311 Neb. 758, 974 N.W.2d 847 (2022). In that case, this court held that a county court lacked authority to tax costs and fees for the allegedly vexatious pursuit of a will contest. In doing so, however, we noted that there was no provision in the Nebraska Probate Code relating to the assessment of costs and attorney fees in a will contest action which had been transferred to a district court and that there was a statute authorizing *the district court* to order a party who pursued proceedings vexatiously or for delay to pay costs to the adverse party. See *In re Estate of Miller, supra* citing Neb. Rev. Stat. § 24-541.10(2) (Reissue 1985).

In this case, unlike *In re Estate of Miller, supra*, Dickie is not asking that an opposing party be ordered to pay his costs on the grounds that the opposing party engaged in vexatious litigation. As we have discussed, he has asked that he be reimbursed by the estate pursuant to § 30-2481. And that is not the only difference between this case and *In re Estate of Miller, supra*. While our opinion in *In re Estate of Miller* noted the absence of a provision in the Nebraska Probate Code addressing the type of fees sought and a specific statute authorizing the district court to order such fees, as we have discussed, the

Nebraska Probate Code has committed the determination of whether a party is entitled to reimbursement under § 30-2481 to the county court.

Although we find that a party's entitlement to reimbursement under § 30-2481 is committed to the county court, we recognize that during a will contest proceeding in district court, the district court may have the occasion to, directly or indirectly, weigh in on whether a nominated personal representative's defense of the will contest was undertaken in good faith. Nothing in this opinion should be read to preclude the county court from considering any such statements along with the rest of the district court record in assessing whether the proceeding was defended in good faith.

For these reasons, we find that the district court lacked jurisdiction to find that Dickie was entitled to attorney fees pursuant to § 30-2481. When we determine that we lack jurisdiction over the decision of a lower court because the lower court lacked jurisdiction, we have the power to vacate the void order of the lower court and, if necessary, to remand the cause with appropriate directions. See *Davis v. Moats*, 308 Neb. 757, 956 N.W.2d 682 (2021). We therefore vacate the portion of the district court's order finding that Dickie was entitled to attorney fees and expenses pursuant to § 30-2481.

## V. CONCLUSION

Because the district court lacked jurisdiction to enter its order awarding attorney fees pursuant to § 30-2481, we vacate that order and dismiss the cross-appeal. As to the issues raised on appeal, we affirm.

Affirmed in part, and in part
vacated and dismissed.