IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

BENTLEY V. SANDHILLS AVIATION

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

NATHAN BENTLEY ET AL., APPELLEES,
V.
SANDHILLS AVIATION, LLC, ET AL., APPELLANTS.

Filed March 10, 2026.    No. A-24-668.

Appeal from the District Court for Douglas County: HORACIO J. WHEELOCK, Judge. Affirmed.

Diana J. Vogt and Robert S. Sherrets, of Sherrets Bruno & Vogt, L.L.C., for appellants.

Scott D. Jochim and Josiah J. Shanks, of Croker Huck Law Firm, for appellees.

MOORE, BISHOP, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Sandhills Aviation, LLC; Sierra Bravo Aviation, LLC; and Steven Sherwood (collectively Appellants) appeal from the Douglas County District Court's order holding Appellants jointly and severally liable to Nathan Bentley, Kelli Bentley, David Bentley, Bentley Aviation Services, LLC, and Meadowlark Aviation, LLC (collectively Appellees), in the amount of $2,462,882.78 for breach of contract, breach of implied covenant of good faith and fair dealing, and fraud, and for denying Appellants' counterclaims for breach of contract, breach of good faith and fair dealing, breach of the master lease, and tortious interference. Appellants contend that the district court erred in awarding damages, in finding that Appellants fraudulently induced Appellees into selling their interest in Sandhills Aviation and Sierra Bravo Aviation, and in denying Appellants' motion to alter or amend the judgment. For the reasons stated herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

### 1. BACKGROUND

In 2015, Steven Sherwood and David Bentley, who were both licensed pilots, formed Sandhills Aviation to provide aviation and aerial surveillance operations for EagleView, a technology company that owned proprietary camera systems designed to capture imagery and data to license or sell to third parties. The relationship was borne out of Steven's prior experience with EagleView as a pilot flying aircraft affixed with EagleView camera systems to collect and capture aerial imagery and geo-positioning data.

On August 1, 2015, Sandhills entered into an Air Services Agreement (hereinafter referred to as the 2015 Air Services Agreement) with EagleView wherein Sandhills agreed to provide and operate four Cessna 172 planes to be affixed with EagleView technology to collect aerial images and data. The 2015 Air Services Agreement required Sandhills to provide aircraft, pilots, aircraft operations, maintenance services, and insurance on the aircraft in exchange for specified compensation. Steven and David formed their own individual LLCs to purchase aircraft to lease to Sandhills to fulfill Sandhills' contractual obligations to EagleView. As relevant to this appeal, David formed Bentley Aviation for the purpose of purchasing two of the four planes to lease to Sandhills for the EagleView contract. Initially, David and Steven each owned, through their respective LLCs, two Cessna 172 planes that were then leased to Sandhills.

The 2015 Air Services Agreement was subsequently amended multiple times. The first of those amendments, entered on June 1, 2016, extended the contract term and increased the number of Cessna 172 aircraft from four to eight. The second amendment entered on July 23, 2018, provided for the addition of five planes referred to as Piper Aztecs. A third amendment entered on July 19, 2019, provided for the addition of three more Piper Aztecs.

Sometime in 2017, David's son, Nathan Bentley, became involved in the Sandhills business. Due to the business expanding and the need for a physical shop location, in 2017, Steven and David purchased a maintenance shop in Wahoo, Nebraska, to perform modifications and maintenance on the aircraft. Steven, David, and Nathan formed Sierra Bravo LLC to own and operate the Wahoo maintenance shop. David, through Bentley Aviation, operated another maintenance shop in Millard, Nebraska. At that time, both David and Steven agreed that each party would be responsible for performing maintenance on their own planes leased to EagleView. After Nathan began taking on more roles for Sandhills, both Steven and David believed that Nathan needed to have "some skin in the game." As a result, Nathan and his wife, Kelli, who also took on a financial role at Sandhills, formed Meadowlark Aviation, LLC, to purchase and lease two planes to Sandhills under the EagleView contract. Following the addition of Nathan's planes, the Sandhills fleet consisted of 8 Cessna 172s and 10 Piper Aztecs. Two of the Piper Aztecs were owned by Nathan and Kelli through Meadowlark Aviation.

On October 19, 2018, Sandhills entered into a separate Air Services Agreement (hereinafter referred to as the 2018 Air Services Agreement) with EagleView wherein Sandhills agreed to provide aircraft operations and maintenance for 25 to 32 planes owned by EagleView in exchange for compensation. This contract required Sandhills to manage and operate the EagleView planes, to train and hire pilots, and to provide maintenance for the planes. Unlike the 2015 Air Services

Agreement that required EagleView to pay Sandhills a monthly sum for each Sandhills plane, which included maintenance costs, the 2018 Air Services Agreement required EagleView to separately pay Sandhills for maintenance costs associated with maintaining EagleView's fleet of planes.

At some point between 2015 and 2018, David, Nathan, and Kelli became the collective owners of David's 50 percent interest in Sandhills and Sierra Bravo, but the record is unclear when or how that took place. At all relevant times, EagleView was the sole customer of Sandhills and Sierra Bravo, and Sandhills was operating under both the 2015 and 2018 Air Services Agreements with EagleView.

### 2. 2018 RIFT

Following the execution of the 2018 Air Services Agreement, Steven and the Bentleys began having disagreements about business finances, including how funds were spent, new hires, payroll and raises, and other expenses. Steven believed that there was more value in the aircraft operation or management side of the business and David believed there was more value in the maintenance side of the business.

### 3. CONTRACT

As a result of the rift between the parties and a pending lawsuit filed by Air America against EagleView that alleged, inter alia, that Steven, as a previous Air America employee, had taken proprietary documents from Air America, which were then utilized to procure the 2018 Air Services Agreement with EagleView, the parties began negotiating Steven's buyout of David, Nathan, and Kelli's 50 percent interest in Sandhills and Sierra Bravo. Initially, Appellees testified they offered to sell Steven the Bentley interest for $7 million, but Steven declined due to insufficient funding. The parties discussed a lower purchase price subject to the Appellees retaining maintenance responsibilities and associated revenues on the fleet of planes, subject to the 2015 and 2018 Air Service Agreements. The parties began referring to that retained maintenance responsibility as "the Right of First Refusal."

On March 30, 2019, the parties entered into a Purchase Agreement, Pledge and Security Agreement, and Master Lease Agreement (the Agreements) whereby Steven agreed to purchase David, Nathan, and Kelli's 50 percent interest in Sandhills Aviation and Sierra Bravo Aviation for $3,500,000 with $500,000 due as a downpayment and the remainder paid in 24 equal monthly installments. As relevant to this appeal, pursuant to the terms of the Purchase Agreement, Bentley Aviation and Meadowlark were required to lease certain aircraft to Sandhills during the terms of the applicable Air Services Agreements between Sandhills and EagleView for specified monthly amounts per leased aircraft. The Agreement further provided that the Appellees were responsible for insuring their own aircraft and for all costs of maintenance and repairs. As it related to the maintenance of the other aircraft in the Sandhills fleet, consisting of planes owned by EagleView under the 2018 Air Service Agreement and planes leased by Steven to Sandhills to service the 2015 Air Service Agreement, Section 4.3 of the Purchase Agreement provided:

> Company [defined as Sandhills and Sierra Bravo collectively] engages [Appellees] through one or more limited liability companies ("Bentley Aviation Services LLC") to perform

scheduled 100 hour air worthiness directive compliance items, annual inspections and repairs discovered during such inspections to include engine and propeller swaps and other requested repairs by Company ("the Services") for the aircraft owned, leased, or operated by the Company or any affiliates thereof. Bentley Aviation Services LLC shall perform such services in accordance with applicable law and reasonable industry standards, and with completion [of] all material documentation with respect to each applicable repair, and in compliance with the terms and conditions of the agreement(s) between [EagleView] and the Company, including seeking prior approval of any repair over $5,000. In consideration of the mutual obligations of this paragraph and to better facilitate such repair and services, (i) Bentley Aviation Services LLC shall designate no fewer than two spots in the hangar facilities operated thereby to be dedicated to aircraft owned or operated by the Company or its affiliates and (ii) for any repair or maintenance that could be performed in any facilities owned, leased, or otherwise operated by [Appellees], as is determined to be commercially viable in the reasonable discretion of the [Appellees], Bentley Aviation Services LLC a right of first refusal [sic] to perform scheduled repair or maintenance services. In consideration for such repair and maintenance services, the Company shall pay for all parts, including any reasonable markup, and the hourly fee of $73 for all aircraft owned by [Steven], pod-related maintenance or oil changes and $100 for all other maintenance (or at such higher rates as may be applicable in the agreement(s) between [EagleView] and the Company). [Appellees] shall maintain, at its expense, shop keepers insurance on terms similar to that which is maintained by Sierra Bravo Aviation LLC as of the date of this agreement.

The Purchase Agreement further provided:

[Appellants] (i) shall also use best efforts to extend the term of applicable agreement(s), . . . (the "Old Agreements"), (ii) shall not agree to terminate or amend the Old Agreements, and (iii) shall include [Appellees] in any and all discussions with [EagleView] and provide [Appellees] with all communications from [EagleView] regarding terminating, modifying and amending the Old Agreements. [Steven] shall also use best efforts to invoice [EagleView] for any revenue generated by the aircraft under the Old Agreements.

## 4. AFTER THE BUYOUT

Following the execution of the agreement, disputes arose between the parties regarding Appellees' maintenance rights and responsibilities under the Purchase Agreement. Appellants immediately cut off Appellees' access to maintenance information and failed to provide to Appellees a complete list of all planes in the "Sandhills Fleet" or inspection information despite Appellees' numerous requests for that information. Despite texts and emails from Appellees indicating their intent to exercise their right of first refusal on any 100-hour or annual inspections coming due, Appellants did not provide the aircraft to Appellees for maintenance services and began using other third-party maintenance shops to service the planes.

In May 2019, Appellees sent Appellants a notice of default related to their right of first refusal. An attempt by the parties to negotiate a settlement was unsuccessful. In July, Appellants notified Appellees that EagleView preferred not to send aircraft to Appellees' maintenance shop due to concerns regarding maintenance issues and EagleView's desire to perform an audit of the maintenance shop. Despite numerous requests, Appellees were unable to obtain a specific list of EagleView's maintenance concerns until Appellants sent Appellees a notice of default in September 2019. Thereafter, in March and April 2020, Appellees sent Appellants two additional notices of default.

## 5. COMPLAINT AND COUNTERCLAIM

In September 2019, Appellees filed a complaint, which was later amended, in the Douglas County District Court against Appellants. Appellees' second amended complaint alleged causes of actions for declaratory judgment, breach of contract, breach of implied covenant of good faith and fair dealing, and common law fraud and deceit. The claims were all centered on Appellants' alleged failure and refusal to allow Appellees to perform maintenance services on the fleet of planes referenced in the Purchase Agreement.

In Appellants' answer and counterclaim, they asserted causes of actions against Appellees for breach of contract, breach of contract involving a lease, breach of implied covenant of good faith and fair dealing, tortious interference, injunctive relief, and declaratory judgment.

## 6. CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

Prior to the trial, the court overruled cross-motions for summary judgment filed by the parties, the parties agreed to dismiss their claims for declaratory judgment, Appellants agreed to dismiss their claim for injunctive relief, and Kelli was dismissed as a party to Appellants' counterclaims.

## 7. TRIAL

Trial was held over 11 days in February, March, and April 2024. Numerous exhibits were received into evidence, including the 2015 and 2018 Air Services Agreements and amendments thereto; the Purchase Agreement; the Master Lease Agreement; the Pledge and Security Agreement; text messages and emails of the parties; Nathan's damages calculation; the notices of default; a partial settlement agreement between the parties; expert reports; tax returns of Sandhills Aviation and Sierra Bravo Aviation; aircraft logbook entries; and various maintenance and expense invoices.

In addition to the facts as stated above, testimony was adduced from Nathan; David; Kelli; Steven; James Rezich, a licensed Airframe and Powerplant (A&P) mechanic, licensed inspection authorized agent (IA), and Federal Aviation Authority (FAA) designated air worthiness representative; William Kenedy, an accredited business valuator and certified public accountant; and Frank Setzler, a licensed A&P mechanic, licensed IA, and private and commercial pilot. Portions of this testimony will be discussed in the argument section of this opinion where applicable.

## 8. Court's Order

Following the trial, the district court denied the Appellants' counterclaims and entered an order in favor of Appellees in the amount of $2,462,882.78. In so finding, the district court specifically stated that it found the Bentleys' testimony to be more credible than Steven's testimony and resolved all conflicts in testimony in favor of Appellees; that Steven's testimony was not credible and not corroborated by any other competent witness or documentary evidence; that Steven's testimony directly contradicted itself multiple times; and that the evidence showed that, despite Steven having complete control over where aircraft was directed for maintenance, he failed to comply with the explicit terms of the right of first refusal. The court specifically found:

> The direct, constant, and unequivocal evidence proves by the greater weight of the evidence and beyond all doubt that [Steven] was doing everything he could to "PHASE OUT" the Bentleys by not sending them aircraft to service at their shop so he could capture that money for his own maintenance businesses. There are at least two occasions where [Steven] admitted that he was going to "PHASE OUT" the Bentleys. First, [Steven] sent a text to his sister, Tiffany Hill, that he would "phase them out . . . . all part of my plans!" (Ex. 121). Second, [Steven] testified about Exhibit 119, which were text messages sent to his business partner, Aaron Miller, eight days before [Steven] signed the Agreement that provided a Right of First Refusal to the Bentleys. [Steven] testified that when he texted Miller that, "The bulk of Sandhills [maintenance] will be Launch Pad moving forward," and that [Steven] planned to "phase them out accordingly," he did not mean the Bentleys when he used the word "them." However, after being subjected to cross-examination and confronted by the actual logbooks of the aircraft which was the subject of that text, he was ultimately forced to change his testimony and admit that he indeed intended to phase the Bentleys out of the maintenance work, instead of some third party maintenance shop as he had claimed during his original testimony.
>
> Furthermore, [Steven]'s actions prove that he was actively "PHASING OUT" the Bentleys. [Steven] formed Launch Pad to provide maintenance services to EagleView and told Dave that it would not compete with the Bentley maintenance shops. However, Exhibits 113 and 114 impeaches [Steven's] testimony and undermines his credibility by proving that [Steven] was ramping up Launch Pad by hiring mechanics in Arizona. Specifically in Exhibit 113, [Steven] asked Miller if hypothetically they had unlimited resources, how many mechanics and avionics guys could Miller get by the end of March 2019, which shows [Steven] was planning on ramping up Launch Pad's capacity to avoid working with the Bentleys for maintenance of the aircraft. Furthermore, [Steven] began charging $125 per hour at Launch Pad, instead of $100 per hour that the Bentleys charged.
>
> While [Steven] was ramping up Launch Pad to do maintenance work, he cut off the Bentley's from "Google Drive Access" and never gave the Bentleys access to "SmartSheets," which are essential tools to provide maintenance to the aircrafts. Miller had access to "SmartSheets" and to the "Google Drive" so that he could perform maintenance on the planes. This is yet another example of [Steven] actively "PHASING OUT" the

Bentleys from their Right of First Refusal to perform maintenance work on the aircraft. [Steven] never told EagleView representatives, his employees, or his business partner in Launch Pad that he had a contractual agreement with the Bentleys regarding a Right of First Refusal for the maintenance of airplanes. Additionally, he never told Dave, Nathan, or Kelli that he was going to phase them out and that the bulk of the maintenance of the aircraft was going to the Launch Pad business. In a text chain between Chad Rhinewald and [Steven] between July 15 to July 25, 2019, [Steven] wrote, "Nathan Bentley will be out of the picture soon." (Ex. 208). "As soon as I finish paying him all minor obligations to him are complete and I cut them out at any time." (Ex. 208). The evidence is clear, constant, and unequivocal that [Steven] intentionally, knowingly, intelligently and with premeditation was actively "PHASING OUT" the Bentleys.

The court further found:

It is clear to the Court that [Steven] had a scheme to purchase the Bentley's company for $3,500,000 instead of the full $7,000,000 as evidenced by the negotiations where they spoke about the purchase price of the Bentley's half for $7,000,000. [Steven] was trying to get the company for half price and said what he needed to say in order for the Bentleys to believe him so that he could get what he wanted. His actions prove that he intentionally was defrauding the Bentleys and trying to steal the company for half price. In essence [Steven] entered into the Agreement by trying to give the Bentleys a "pig in a poke" when in reality he was capturing the maintenance business for himself.

As it related to the expert testimony, the court found that Rezich's testimony was more credible than Setzler's testimony and that both experts agreed that the party in operational control of the aircraft, in this case Sandhills, was responsible for directing inspections and maintenance of the planes. The court further found that Setzler's testimony was biased because Setzler and Steven had a business relationship for the past 15 years.

In considering the specific claims, the court found that the evidence supported that there was an enforceable contract; that the Appellees' right to service the aircraft was a material term; that Steven had the authority to direct where the planes were maintained; that Steven was not providing planes for maintenance to the Appellees but was, instead, funneling aircraft maintenance through his own maintenance facilities; that Appellants breached the right of first refusal; that Appellants failed to prove that Appellees breached the contract prior to Appellants' breach by failing to seek approval for repairs over $5,000 and that there was no credible evidence that Appellees violated FAA or industry standards for maintenance services; that Appellants breached the implied covenant of good faith and fair dealing when agreeing to amendments of the Air Services Agreement before complying with the Agreements, which required Appellants to include Appellees in negotiations for amendments to the Air Services Agreements; that Appellants engaged in fraudulent misrepresentation relating to the Appellees' right of first refusal; that Appellees suffered damages; and that Appellants failed to prove their affirmative defenses and counterclaims.

As it related to Appellees' damages claim for lost profits, the court stated:

Here, the Bentleys' shop was essentially a new business and as such did not have tax returns that could be used to calculate a damages figure. Instead, Nathan testified that he relied on third party invoices for work performed on the aircraft that were subject to the Right of First Refusal. (See also, Ex. 348). These invoices detail the work performed on aircraft that should have been offered to the Bentleys pursuant to the Right of First Refusal but were instead diverted to third party shops. There is no evidence these invoices were contested or disputed. These documents allow the Court to estimate actual damages with a reasonable degree of certainty and exactness. Furthermore, Nathan testified he calculated damages by using the $100 per hour rate that was specified in the Agreement. (See also, Ex. 349). Nathan testified that he was involved in the business operations of [Appellees'] businesses in roles that included vice president and designated representative. He testified that he received a business administration degree from the University of Nebraska and a juris doctor degree from the University of Florida where he enrolled in business law courses including tax accounting and corporate law. After law school, he worked in the area of mergers and acquisitions as well as in employee and executive benefits and calculated damage figures as part of his employment. Nathan testified that he has a thorough knowledge and understanding of the operations, expenses, and profits of [Appellees'] businesses. [Appellees] provided evidence of the gross profits and losses along with the expenses for [Appellees'] businesses. (See Ex. 249). Thus, there is sufficient evidence in the record to support a damage award for lost profits. While [Appellees] requested $3.6 Million in damages, the Court finds that amount would be punitive based on the evidence in the record. During the trial, [Appellees] did not identify a specific monetary amount requested for each of their claims; therefore, the Court awards $2,462,882.78 to each claim proven by [Appellees] but notes the total recovery does not exceed $2,462,882.78.

### 9. MOTION FOR NEW TRIAL AND MOTION TO ALTER OR AMEND

Appellants subsequently filed a motion for new trial and motion to alter or amend the judgment based on the court's award of lost profits. Following the hearing thereon, the district court denied Appellants' motion.

Appellants have now appealed from the district court's order.

### III. ASSIGNMENTS OF ERROR

Appellants assign, consolidated and renumbered, that the district court erred in (1) allowing speculative damages for lost future profits to a new business by (a) allowing Nathan to testify to damages, even though he was not an expert or qualified lay witness; (b) admitting third-party invoices into evidence over hearsay objections and allowing use of invoices to support Appellees' calculation of damages; (c) awarding damages to Appellees even though Appellees never operated with the number of mechanics or locations necessary to fulfill its obligations under the right of first refusal; (d) awarding lost profits to a "new business" without its own business records; and (e) awarding damages that were speculative and conjectural, not supported by the evidence, and

were contrary to law; (2) finding Steven fraudulently induced Appellees to sell their 50 percent interest in Sandhills to him because (a) the Bentleys suffered no damages, (b) the undisputed testimony showed Sandhills was worth only $7 million, and (c) the Bentleys' interference with the 2018 Air Services Agreement with EagleView caused it to be cancelled; and (3) denying Appellants' motion to alter or amend the judgment to deny Appellees' request for lost profits.

We note that Appellants' brief fails to comply with Neb. Ct. R. App. P. § 2-109(D)(1)(e) and (i), and that some arguments scattered throughout the argument section of the brief are not assigned as error. Therefore, we decline to address Appellants' arguments that the court erred in directly examining Nathan regarding the third-party invoices; allowing damages calculated over the course of 6.5 years, despite EagleView's alleged termination of the 2018 Air Services Agreement; adopting Nathan's calculation, even though it did not use an accepted and reliable methodology; adopting Nathan's damage calculation, which utilized third-party invoices despite not having an adequate sample size; adopting Nathan's damage calculation which ignored the costs associated with maintenance of the Appellees' own aircraft and failure to include other specific expenses; and in finding that Appellees did not tortiously interfere with the 2018 Air Services Agreement insofar as Appellants attempted to assert that argument in relation to their assignment of error relating to Appellees' fraudulent misrepresentation claim. To be considered by an appellate court, an error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *ACI Worldwide Corp. v. Baldwin Hackett & Meeks*, 296 Neb. 818, 896 N.W.2d 156 (2017). Parties who wish to secure appellate review of their claims must abide by the rules of the Nebraska Supreme Court. *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014). Any party who fails to properly identify and present its claim does so at its own peril. *Id*. Accordingly, we decline to consider these claims that were argued but not assigned as error.

## IV. STANDARD OF REVIEW

In a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony and an appellate court will not reevaluate the credibility of witnesses or reweigh testimony but will review the evidence for clear error. *U.S. Pipeline v. Northern Natural Gas Co.,* 303 Neb. 444, 930 N.W.2d 460 (2019). Similarly, the trial court's factual findings in a bench trial of an action at law have the effect of a jury verdict and will not be set aside unless clearly erroneous. *Id.* In reviewing a judgment awarded in a bench trial of a law action, an appellate court considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Id*.

The standard for reviewing the admissibility of expert testimony is abuse of discretion. *Id*.

An award of damages may be set aside as excessive or inadequate when, and not unless, it is so excessive or inadequate as to be the result of passion, prejudice, mistake, or some other means not apparent in the record. *de Vries v. L&L Custom Builders,* 310 Neb. 543, 968 N.W.2d 64 (2021). On appeal, the fact finder's determination of damages is given great deference. *Id.*

The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a

reasonable relationship to the elements of the damages proved. *TNT Cattle Co. v. Fife*, 304 Neb. 890, 937 N.W.2d 811 (2020).

A motion for new trial is to be granted only when error prejudicial to the rights of the unsuccessful party has occurred. *In re Estate of Koetter*, 312 Neb. 549, 980 N.W.2d 376 (2022). An appellate court reviews a denial of a motion to alter or amend the judgment for an abuse of discretion. *de Vries v. L&L Custom Builders, supra*.

## V. ANALYSIS

### 1. DAMAGES

Appellants first assign and argue that the district court erred in allowing speculative damages for lost future profits to a new business by (a) allowing Nathan to testify to damages even though he was not an expert or qualified lay witness; (b) admitting third-party invoices into evidence over hearsay objections and allowing Appellees' use of the invoices to support Appellees' calculation of damages; (c) awarding damages to Appellees, even though Appellees never operated with the number of mechanics or locations necessary to fulfill its obligations under the right of first refusal; (d) awarding lost profits to a "new business" without its own business records; and (e) awarding damages that were speculative, conjectural, not supported by the evidence, and were contrary to law. We will analyze these assignments independently.

### (a) Testimony of Nathan Bentley

Appellants assert that the district court erred in allowing Nathan to testify to Appellees' damages when Nathan was not a qualified expert witness or qualified lay witness. Appellants contend that Nathan was not the owner of Bentley Aviation, was not involved with Bentley Aviation until 2017, did not become an officer until 2019, was not a pilot or mechanic, and had only worked with Bentley Aviation for 2 to 3 years at the time of the events giving rise to the present action. Further, Appellants argue that Nathan was not qualified to testify as an expert witness in calculating damages because his "only qualifications were having taken a couple of related classes during law school and working for a law firm doing [mergers and acquisitions] and Employment law work where he sometimes 'calculated damages.'" Brief for appellant at 24.

Lay witness testimony and expert testimony are governed by Neb. Rev. Stat. §§ 27-701 and 27-702 (Reissue 2016). The trial court is given large discretion in determining whether or not a witness' qualification to state an opinion has been established, and such discretion will not ordinarily be disturbed on appeal unless there is an abuse of that discretion. *Schmidt v. J.C. Robinson Seed Co.*, 220 Neb. 344, 370 N.W.2d 103 (1985).

During the trial, Nathan testified that he had a business administration degree and a juris doctor degree. Nathan testified that after obtaining his law license, he began doing transactional work in mergers, acquisitions, and investitures, which included calculating damages. Nathan testified that his experience in the aviation industry began when he was young and his father was a pilot. Nathan became involved with Sandhills in 2017 and eventually helped establish the Sierra Bravo maintenance shop. Nathan testified that he also owned his own aircraft through an entity called Meadowlark Aviation. Nathan stated that he became more involved in the business, helping with legal matters; payroll; maintenance coordination; negotiating contracts; and calculating

- 10 -

revenue, expenses, and profits for Sierra Bravo. Nathan testified that his role expanded after the buyout, but that he continued to do all the recordkeeping for the maintenance shop. Exhibit 347, Nathan's damage calculation, was received into evidence over Appellants' objection. Nathan testified that he created the damage calculation as depicted in exhibit 347 by examining actual invoices generated for maintenance costs on Sandhills' fleet of planes subject to the 2015 and 2018 Air Services contract with EagleView, from which he derived material costs and time incurred for annual and 100-hour inspections, computed the labor rate as provided by contract, and factored in labor costs to perform work along with all overhead expenses to ascertain lost profits. In short, Appellants claim Nathan lacked sufficient foundation to perform this calculation.

*In ACI Worldwide Corp. v. Baldwin Hackett & Meeks*, 296 Neb. 818, 896 N.W.2d 156 (2017), the Nebraska Supreme Court considered a similar argument wherein an owner of the defendant company was allowed to testify to the value of lost profits sustained by the defendant despite the plaintiff's contention that the owner was not formally trained to conduct a lost profits analysis and did not have an accounting degree. In finding no error in the district court's determination that the owner was qualified, the Nebraska Supreme Court stated:

> However, there is no exact standard for fixing the qualifications of an expert witness, and a trial court is allowed discretion in determining whether a witness is qualified to testify as an expert. Unless the court's finding is clearly erroneous, such a determination will not be disturbed on appeal. Experts or skilled witnesses will be considered qualified if they possess special skill or knowledge respecting the subject matter involved superior to that of persons in general, so as to make the expert's formation of a judgment a fact of probative value. And a witness may qualify as an expert by virtue of either formal training or actual practical experience in the field.

> As BHMI points out, we have previously allowed principals of businesses to opine regarding lost profits suffered by their businesses. For example, we found that the owner of farmland had sufficient basis to opine on lost profits resulting from a decrease in crop yields, that a principal stockholder of a manufacturing business was qualified to testify about lost profits of that business, and that the owner of a distributorship was qualified to testify regarding lost profits suffered by his business. Although we allowed owners to testify on lost profits, we note that in each case, it was the practical experience of the owner as it relates to that particular business which established the foundation for the opinion, not just ownership. The same is true here.

> Jack's knowledge about BHMI's lost profits is clearly superior to that of persons in general. Jack handles all of BHMI's finances and has had 30 years' practical experience running BHMI. Jack is knowledgeable about the costs incurred to develop and license TMS. He is aware of BHMI's current and potential customers and the prices BHMI charges for its licensing. For these reasons, we find the district court did not commit clear error in finding that Jack was qualified to testify, did not abuse its discretion in allowing Jack to opine on BHMI's lost profits, and did not abuse its discretion in overruling ACI's motion to vacate *the 2015 judgment due to the qualifications of Jack.*

*Id.,* 296 Neb. at 871-72, 896 N.W.2d at 192-93 (emphasis in original.)

We make similar findings here. Nathan testified to his comprehensive practical experience and understanding of line items associated with generating profits in an aircraft maintenance business in that he routinely calculated revenue, expenses, and lost profits for the Sierra Bravo maintenance shop before the buyout and continued to do so for Bentley Aviation after the buyout. Nathan also testified that he had prior experience calculating damages for businesses as a transactional business attorney prior to becoming involved with Sandhills, Sierra Bravo, and Bentley Aviation. Nathan's knowledge about Bentley's lost profits is clearly superior to that of persons in general and the record establishes that Nathan's practical experience in relation to the aircraft maintenance business, the revenues and costs associated with running the business, and his familiarity with the contracts involved here rendered him sufficiently knowledgeable to opine on Appellees' lost profits. On this record, we find that the district court did not err in finding that Nathan was qualified to testify to Appellees' damages resulting from Appellants' breach of the Purchase Agreement.

(b) Admission and Use of Third-Party Invoices

Appellants contend that the court erred in admitting invoices from non-party entities contained in Exhibit 348 in that the invoices constituted inadmissible hearsay. Appellants argue that the district court erred in finding that the business record exception to the hearsay rule applied because Appellees did not satisfy the foundational elements under the exception. Appellants further argue that the court erred in allowing Appellees to utilize the third-party invoices because "Nathan lacked sufficient information to provide foundation for the third-party invoices to make his testimony about those invoices admissible." Brief for appellant at 25. Appellants argue that if Nathan, testifying as an expert, could not provide adequate factual foundation, the court should have excluded Nathan's testimony regarding the invoices as unreliable.

Appellants' objection relates to the composition of exhibit 348. Exhibit 348 consists of hundreds of invoices used to support Nathan's calculation of damages as set forth in exhibit 347. Nathan testified that the invoices attached to exhibit 348, used to support his calculations in exhibit 347, were actual invoices generated from maintenance work performed on the fleet of planes managed by Sandhills under its contracts with EagleView. Nathan testified that pages 1 through 226 were invoices that contained data utilized in calculating Appellees' direct revenue and costs in maintaining the planes and pages 227 through 366 were utilized to support Appellees' overhead and expense computations. Appellants posed foundational and hearsay objections to exhibit 348. The district court overruled Appellants' objections and stated:

> To be specific, . . . foundation has been laid both by [Steven] and [Nathan]. 99 percent of the invoices in Exhibit 348 were emailed either to the Bentleys or to Sandhills. They were paid for on [Steven's] side by credit card and check. He kept the records for some of them in paper copy, and the other ones he kept by way of QuickBooks. That's in the regular course of business. And he is the custodian of the records.

> With regard to the Bentley testimony, what went to the Bentleys was either sent by [Steven] or went to the Bentleys directly. Nathan . . . kept them in the regular course of business, he paid them, and he keeps them in folders.

> . . . .

With regard to Exhibit 348, proper foundation has been laid. Proper foundation has been laid for the hearsay exception to the business record. And in the alternative, the invoices themselves are not hearsay. They are records. [Exhibit] 348 is received.

Thereafter, the following colloquy took place:

[Appellants' Counsel]: Yes, Judge. Part of the foundation necessary to admit something as a business record, second prong here is the proponent must establish that the record was made as a part of regular business practice at or near the time the event was recorded. No testimony was offered or could be offered because [Steven] testified he doesn't work at any of these third-party entities: Aero Guard, Aviation Services, or anything else. No one knows when and how these were created because there's been no testimony to that effect.

THE COURT: Well, the testimony was that they would receive it by either -- 99 percent by email. These are invoices. So I'm ruling both ways: The words of legal significance, nonhearsay, but also once they receive it, they become a business record because of what [Steven] testified to. So it's actually a double hearsay issue. But it's duly noted. [Exhibit] 348 is received in its entirety.

Appellants contend that exhibit 348 was inadmissible because it failed to satisfy the foundational elements for the business record exception to the hearsay rule. Appellants further argue that the invoices from third parties to Sandhills did not constitute words of legal significance because they "neither created not affected a relationship between Appellees and the third parties." Brief for appellant at 35.

In *132 Ventures v. Active Spine Physical Therapy*, 318 Neb. 64, 88-89, 13 N.W.3d 441, 460–61 (2024), the Nebraska Supreme Court stated:

Under Neb. Rev. Stat. § 27-803 (Cum. Supp. 2022) of the rules of evidence, we have held that routine recordkeeping, essential to the conduct of business, produces the reliability necessary for admissibility of business records. Section 27-803 of the rules of evidence provides that business records are not excluded by the hearsay rule. Under Neb. Rev. Stat. § 27-801(3) (Cum. Supp. 2022), "[h]earsay is a statement, other than one made by the declarant while testifying at the trial ... offered in evidence to prove the truth of the matter asserted." Under Neb. Rev. Stat. § 27-802 (Reissue 2016), "[h]earsay is not admissible except as provided by these rules, by other rules adopted by the statutes of the State of Nebraska, or by the discovery rules of the Supreme Court." Business records are defined as "[a] memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, other than opinions or diagnoses, that was received or acquired in the regular course of business by an entity from another entity and has been incorporated into and kept in the regular course of business of the receiving or acquiring entity; that the receiving or acquiring entity typically relies upon the accuracy of the contents of the memorandum, report, record, or data compilation; and that the circumstances otherwise indicate the trustworthiness of the memorandum, report, record, or data compilation, as shown by the testimony of the custodian or other qualified witness."

Applying that rule, the Nebraska Supreme Court held that invoices reflecting "CAM" charges received by a company were excepted from the hearsay rule as business records because they consisted of

> data compilations of acts, events, or conditions received or acquired in the regular course of business "by an entity from another entity," incorporated into and kept in the regular course of business of the receiving or acquiring entity. There is no dispute that the CAM charges were received from the third-party providers in Ventures' normal course of business. Also, White and Bogard testified that the documents were created in the ordinary course of business and that the management company typically relied upon the accuracy of the contents of the invoices, ledger, and reconciliation in conducting its operations.

*132 Ventures,* 318 Neb. at 89-90, 13 N.W.3d at 461.

The same applies here. Both Steven and David established that the invoices reflected maintenance costs generated by third-party maintenance service providers that provided maintenance on the fleet of planes subject to the 2015 and 2018 Air Service Agreements. In fact, the invoices reflected actual service Appellees claimed it was contractually entitled to perform on the planes but for Appellants' diversion to other maintenance companies. Appellants appear to argue that Nathan was required to lay foundation for the maintenance shops which produced the invoice. But Appellants' argument misinterprets Neb. Rev. Stat. § 27-803(6)(b) (Cum. Supp. 2024). That section provides that business records include records acquired in the regular course of business by an entity from another entity and then kept in the regular course of business by the receiving entity. To that end, both Steven and David testified that the invoices were normally acquired from third-party maintenance providers in Sandhills' and Bentley Aviation's normal course of business, were regularly maintained by Sandhills and Bentley Aviation in the regular course of that business, and were subsequently paid and used to compile their tax returns and financial statements, and that Sandhills and Bentley typically relied upon the accuracy of the contents of the invoices in making payments for the services rendered. Nathan then used these very invoices, reflecting work actually performed and paid for on the planes that Appellees believed they were entitled to perform, to calculate the profits lost because the work was diverted elsewhere. On this record, we find that the district court did not err in overruling Appellants' objections to the invoices in exhibit 348 on the basis that the testimony established they were business records excepted from the hearsay rule. And because we have found the invoices constituted business records, we need not address Appellants' other assignment that the district court erred in finding the records contained words of legal significance thereby requiring application of the hearsay rule.

(c) Awarding Damages Despite
Inability to Fulfill Obligations

Appellants next assign and argue that the court erred in awarding damages to Appellees because Appellees "never operated with the number of mechanics or locations necessary to fulfill its obligations" under the right of first refusal.

Here both David and Nathan testified that the maintenance shops had the capacity to perform all the inspections pursuant to the right of first refusal. Nathan's damage calculation included a calculation of the amount of hangar spots needed to complete the inspections, the length of time it would take to complete the inspections, the number of inspections the Appellees were capable of performing each year at each shop location, and the planned number of inspections. Further, Nathan testified that had he been provided with a complete list of the Sandhills Fleet, the number of flying hours, the dates of the annual inspections, and other information, he could have staggered the scheduling and if needed, outsourced the maintenance on the Bentley-owned planes.

Further, Nathan testified that around May 2019, 2 months after the parties entered into the Agreements, Appellees lost mechanics and had to let others go because the mechanics were only paid for labor hours and Appellants were not sending aircraft to Appellees. David testified to the same. At that time, Nathan testified that Appellees had three or four mechanics at the Plattsmouth shop and five or six at the Millard shop. Nathan testified that although they intended to hire additional mechanics, Appellees could not hire additional mechanics because the right of first refusal was not being honored and Appellees were attempting to mitigate their damages. Although Steven provided conflicting testimony doubting Appellees' capacity to complete the inspections, we defer to the court's credibility determination. In a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony, and an appellate court will not reevaluate the credibility of witnesses or reweigh testimony but will review the evidence for clear error. *U.S. Pipeline v. Northern Natural Gas Co.,* 303 Neb. 444, 930 N.W.2d 460 (2019). Here, the district court specifically stated that it found Appellees' testimony more credible than Appellants' testimony, and we will not reweigh that credibility determination.

(d) Awarding Lost Profits to New Business With No Records

Appellants contend that the district court erred in awarding damages for lost profits because a new business is not entitled to recover lost profits and because Appellees did not provide records or financial data to support their claim for lost profits.

Although in many, if not most, instances lost profits from a new business are too speculative and conjectural to permit recovery of damages, where the evidence is available to furnish a reasonably certain factual basis for computation of probable losses, recovery of lost profits cannot be denied, even though a new business venture is involved. *El Fredo Pizza, Inc. v. Roto-Flex Oven Co.,* 199 Neb. 697, 261 N.W.2d 358 (1978). The fact that a business is new is relevant only insofar as that fact affects the certainty of proof of lost profits; it does not establish as a matter of law that damages for lost profits may not be recovered. *Id*.

Although Appellees argue that Bentley Aviation was a new business, it was formed in 2015 for the purpose of purchasing, modifying, and maintaining aircraft to provide to Sandhills to fulfill its obligations under the 2015 Air Services Agreement. Bentley Aviation further expanded into owning and operating maintenance shops, specifically the maintenance shops at the Millard Airport and the one in Plattsmouth. Bentley Aviation had been performing maintenance on aircraft since its formation in 2015. Although we question the conclusion that Bentley Aviation was a new business, assuming without deciding it was, that conclusion is not dispositive. See *id*. We will address whether the damages were reasonably certain later in this opinion.

- 15 -

As it relates to Appellants' claim that Appellees failed to provide sufficient financial data, business records, or a comprehensive list of expenses to support the damage award, we disagree. The Nebraska Supreme Court stated in *ACI Worldwide Corp. v. Baldwin Hackett & Meeks,* 296 Neb. 818, 876, 896 N.W.2d 156, 195 (2017), that "a claim for lost profits must be supported by some financial data which permit an estimate of the actual loss to be made with reasonable certitude and exactness." In that case, the plaintiff argued that the damage calculation was insufficient because the defendants "failed to offer any quantifiable business records (income tax return, profit/loss statements or business records) to support its future lost profits calculation." *Id*. In finding that the financial data was sufficient, the court stated that the defendant's calculation was based on actual contracts negotiated on behalf of the defendant and defendant's lost profit analysis was not solely supported by his own testimony as it was further supported by the testimony of an executive officer for the plaintiff who provided that it was reasonable to expect the defendants to obtain two additional customers per year.

In the case at bar, the record provides that Nathan calculated damages based on the specific Agreements entered into by the parties. That is, the 2015 and 2018 Air Service Agreements which collectively provided that Sandhills was required to maintain the fleet of planes subject to those Air Service Agreements and that under the Purchase Agreement, Steven was obligated to refer that maintenance to Appellees. The evidence established there was profit associated with this maintenance work, and the district court's finding that Steven diverted that work to himself and others most certainly establishes the fact that profits were lost by Appellees. In calculating what the loss consisted of, Nathan provided numerous invoices documenting the actual maintenance work provided on the fleet of planes that was supposed to be performed by Appellees. To that end, the invoices reflected the actual parts and labor hours utilized in maintaining the fleet. Nathan then utilized those actual numbers, but applied labor rates Appellees were entitled to charge for the same work on the planes. More specifically, he calculated the number of 100-hour and annual inspections necessary for the fleet of planes subject to Appellees' right of first refusal, used the labor revenue rate authorized by the contracts, utilized the actual labor hours from the invoices actually spent on the planes, deducted maintenance labor costs for the same labor hours at $25 per hour while including salaries for office management and maintenance coordination, and included overhead costs for expenses associated with the shops, insurance, utilities, and other expenses associated with operating its maintenance business.

On this record, we find that this financial data was sufficient, it supported Appellees' damage calculation, and Nathan's calculation was not solely supported by his own testimony. We next turn to the question of whether damages for lost profits were proven with reasonable certainty.

(e) Awarding Speculative Damages

In addition to Appellants' claims that a new business is not entitled to recover lost profits and that the calculation was not sufficiently supported by financial data for the court to estimate the loss with reasonable certitude and exactness, Appellants argue that the court erred in awarding damages which were speculative and conjectural, were not supported by the evidence, and were contrary to law.

In *Dietzel Enters. v. J. A. Wever Constr.*, 312 Neb. 426, 447, 979 N.W.2d 517, 534 (2022), the Nebraska Supreme Court stated:

> We have said that "damages, like any other element of the plaintiff's [cause of action], must be pled and proved and that the burden is on the plaintiff to offer evidence sufficient to prove the plaintiff's alleged damages." *Pan v. IOC Realty Specialist,* 301 Neb. 256, 276, 918 N.W.2d 273, 291 (2018). Evidence of damages must be sufficient to enable the trier of fact to estimate actual damages with a reasonable degree of certainty and exactness. *Id.* Proof of damages to a mathematical certainty is not required; however, a plaintiff's burden of offering evidence sufficient to prove damages cannot be sustained by evidence which is speculative and conjectural. *Id.* Although the standard of review on appeal for the amount of damages is generally deferential to the trier of fact, the question of whether the evidence of damages is reasonably certain is a question of law. See, *id.* (damages award "will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of the damages proved"); *Pribil v. Koinzan*, 266 Neb. 222, 227, 665 N.W.2d 567, 572 (2003) ("[w]e have consistently framed the question whether the evidence of damages is 'reasonably certain' as a question of law . . .").

In a breach of contract case, the ultimate objective of a damages award is to put the injured party in the same position the injured party would have occupied if the contract had been performed, that is, to make the injured party whole. *Gary's Implement v. Bridgeport Tractor Parts,* 281 Neb. 281, 799 N.W.2d 249 (2011). One injured by a breach of contract is entitled to recover all its damages including the gains prevented as well as the losses sustained, provided the damages are reasonably certain and such as might be expected to follow the breach. *Id.* While damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural. *Id.*

Here, the district court awarded Appellees damages for Appellants' breach of the right of first refusal, breach of good faith and fair dealing, and fraud finding that:

> These invoices detail the work performed on aircraft that should have been offered to the [Appellees] pursuant to the Right of First Refusal but were instead diverted to third-party shops. There is no evidence these invoices were contested or disputed. These documents allow the Court to estimate actual damages with a reasonable degree of certainty and exactness. Furthermore, Nathan testified he calculated damages by using the 100 per hour rate that was specified in the Agreement. (See also, Ex. 349). . . . While the [Appellees] requested $ 3.6 Million in damages, the Court finds that amount would be punitive based on the evidence in the record. During the trial, [Appellees] did not identify a specific monetary amount requested for each of their claims; therefore, the Court awards $2,462,882.78 to each claim proven by [Appellees] but notes the total recovery does not exceed $2,462,882.78.

According to the court's award, it accepted Nathan's damage calculation contained in Exhibit 349 using the $100 per labor hour for maintenance on EagleView aircraft, instead of the

- 17 -

$125 per labor hour that Steven began charging EagleView in July 2019 as depicted in Nathan's damage calculation in Exhibit 347. The calculations are otherwise the same.

Here, Nathan's calculation was neither speculative nor conjectural. Instead, it established the number of service hours and parts that would be required to service the fleet of planes as required by the 2015 and 2018 Air Service Agreements. To do this, Nathan was able to obtain those numbers by examining the Air Service Agreements and invoices produced that demonstrated the maintenance requirements to service those planes. More specifically, these documents allowed Nathan to extrapolate the number of annual and 100-hour service requirements for the fleet of planes required to be serviced (rightfully excluding the Bentley leased planes); to obtain the labor hours actually used to perform that maintenance; to identify the parts that were necessary to perform that maintenance; to utilize labor rates provided by the contracts and part markups; and to project direct and indirect costs associated with performing that work, including labor costs, facility costs, utilities, insurance and other costs associated with the maintenance business. And although it is impossible to project profits with complete mathematical certainty, as planes will have different maintenance needs over the course of time, providing an average of such revenue and expenditures actually incurred (but outsourced to other providers) for annual and 100-hour inspections during the term of the agreements provides a logical and statistically sufficient basis to estimate lost profits in a situation like this. And we note that during the term of the agreements, each plane would have undergone between five to seven 100-hour inspections in a year, Nathan's calculations conservatively estimated two to three 100-hour inspections in a year, conservatively included costs for a third location; and included costs for additional mechanics and staff.

Uncertainty as to the fact of whether damages were sustained at all is fatal to recovery, but uncertainty to amount is not if the evidence furnishes a reasonably certain factual basis for computation of the probable loss. *TNT Cattle Co. v. Fife,* 304 Neb. 890, 937 N.W.2d 811 (2020). The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. *Id.*

Here, we find that the court's determination on the damages was supported by the evidence and bore a reasonable relationship to the elements of the damages proven. Accordingly, this assignment of error fails.

### 2. FRAUDULENT INDUCEMENT

Appellants assign that the court erred in finding that Steven fraudulently induced the Bentleys into selling their interest in Sandhills and Sierra Bravo to Steven because (a) the Bentleys had no damages; (b) the Bentleys were paid $3.5 million; and (c) the Bentleys interfered with the 2018 Air Services Agreement between Sandhills and EagleView, causing EagleView to terminate the agreement. We will discuss these assignments independently.

A fraudulent misrepresentation claim requires a plaintiff to establish the following elements: (1) A representation was made; (2) the representation was false; (3) when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) the representation was made with the intention that the plaintiff should rely

- 18 -

on it; (5) the plaintiff did so rely on it; and (6) the plaintiff suffered damage as a result. *Brauer v. Hartmann*, 313 Neb. 957, 987 N.W.2d 604 (2023).

Appellants first argue that there was insufficient evidence to support a finding of fraud because Appellees did not provide evidence of damages. Appellants do not contest the sufficiency of the evidence to support the remaining elements. Appellants raise two arguments in support of their claims. First, they argue the business itself was worth only $7 million when it was sold and Appellees received $3.5 million in cash reflecting half of its value. As such, Appellants claim Appellees were not entitled to more than ½ of that value and lost profits from future maintenance would serve as a windfall. Second, Appellants claim that Appellees tortiously interfered with Sandhills' contract with EagleView which caused EagleView to eventually cancel the 2018 Air Services Agreement which substantially eliminated future planned maintenance revenue through the tortious actions of Appellees.

As it relates to Appellants' second argument, the district court rejected and dismissed Appellants' counterclaim that Appellees tortiously interfered with Sandhills' contract with EagleView. Instead, the district court found that Appellants were the first to breach the contract, there was no legally sufficient reason to do so, and that although Sandhills renegotiated the Air Services Agreement with EagleView in 2020, Steven failed to include the Bentleys in that negotiation all of which negated any claim for a reduction in damages. Appellants did not assign error to any of those findings. As such, those findings became the law of the case and we therefore reject Appellants' unassigned error that a reduction in future maintenance revenue was a result of their own tortious conduct.

As to the Appellants' first argument, although we recognize Appellants attempted to assert during trial that the business was worth only $7 million, there was conflicting testimony from Nathan that the Bentleys initially offered to sell Steven their 50 percent interest for $7 million, but eventually agreed to the reduced price because of their contractually reserved right to generate additional revenue from maintenance of the fleet during the remainder of the terms of the Air Service Agreements. Further, Nathan testified at trial that he specifically rejected Appellants' contention that the entirety of the business was worth $7 million. David testified that he valued the business at $18 million based upon all sources of revenue available under the Air Service Agreements. There was also conflicting testimony from the expert witnesses governing the value of the business.

In relation to this conflict in evidence, the district court found:

It is clear to the Court that [Steven] had a scheme to purchase the Bentley's company for $3,500,000 instead of the full $7,000,000 as evidenced by the negotiations where they spoke about the purchase price of the Bentley's half for $7,000,000. [Steven] was trying to get the company for half price and said what he needed to say in order for the Bentleys to believe him so that he could get what he wanted. His actions prove that he intentionally was defrauding the Bentleys and trying to steal the company for half price. In essence [Steven] entered into the Agreement by trying to give the Bentleys a "pig in a poke" when in reality he was capturing the maintenance business for himself.

- 19 -

And regardless of the value of the company, Appellees testified that, as a result of their reliance on Steven's representations regarding the right of first refusal and its inclusion in the Purchase Agreement, they sold their 50 percent interest to Steven; that they would not have sold that interest without that contractual right; that they continued to expand the maintenance operation by opening a facility in Plattsmouth; that they hired mechanics from Sierra Bravo in anticipation of servicing the fleet; that they brought over a director of communications and a shop manager for the same purpose; and that they began preparation for opening a third location to support the predictable scope of work. Based upon the evidence adduced at trial, the court's findings are supported by the record. And to the extent Appellants are requesting this court to reweigh the court's credibility and factual findings which are supported by this record, we will not reevaluate the credibility of witnesses or reweigh testimony. See *U.S. Pipeline v. Northern Natural Gas Co.,* 303 Neb. 444, 930 N.W.2d 460 (2019). This assignment of error fails.

### 3. MOTION TO ALTER OR AMEND

Appellants assign and argue that the court erred in denying their motion to alter or amend the judgment to deny Appellees' request for lost profits. Appellants contend that its brief in support of the motion to alter or amend pointed out deficiencies in Appellees' foundation for calculating its lost profits, but despite that, the district court denied Appellants' request to alter or amend the judgment relating to the award of lost profits.

Based on our findings set forth above, we find that the district court did not err in denying Appellants' motion to alter or amend the judgment based on the court's award of damages.

## VI. CONCLUSION

For the reasons stated above, we affirm.

AFFIRMED.